UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DISTRICT

SHEILA TATUM BUTLER,

      Plaintiff,

v

CIENA HEALTH CARE
MANAGEMENT, INC. and
HARTFORD NURSING AND
REHABILITATION CENTER,

      Defendants.

_____/

Civil Case No.: 16-14071

Honorable Hon. Sean F. Cox

**DEFENDANT HARTFORD NURSING AND REHAB'S MOTION FOR SUMMARY JUDGMENT**

**BRIEF IN SUPPORT**

**CERTIFICATE OF SERVICE**

**EXHIBITS**

KITCH DRUTCHAS WAGNER
VALITUTTI & SHERBROOK

Karen B. Berkery P38698
Zeth D. Hearld P79725
Attorneys for Ciena Health Care
Management, Inc. and Hartford
Nursing and Rehabilitation Center
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
313-965-7846
Zeth.hearld@kitch.com

Kitch Drutchas
Wagner Valitutti
& Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward
Avenue, Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

## <u>DEFENDANTS CIENA HEALTH CARE MANAGEMENT, INC. AND HARTFORD NURSING AND REHABILITATION CENTER'S MOTION FOR SUMMARY JUDGMENT</u>

NOW COME defendants, CIENA HEALTH CARE MANAGEMENT, INC. and HARTFORD NURSING AND REHABILITATION, by and through their attorneys, KITCH DRUTCHAS WAGNER VALITUTTI & SHERBROOK, and in support of their Motion for Summary Judgment, state as follows:

1.      On January 24, 2017, Sheila Tatum Butler ("Plaintiff") filed her First Amended Complaint, alleging violations of the Fair Labor Standards Act §201 *et seq.*

2.      Specifically, Plaintiff alleges she is owed past wages for alleged time spent working on-call or overtime.

3.      Defendant Ciena Health Care Management ("Ciena") manages Defendant Hartford Nursing and Rehabilitation Center ("Hartford"). (Ex. A, Management Agreement)

4.      Plaintiff was employed by Defendant Hartford as a Director of Admissions and Marketing. Plaintiff was never employed by Defendant Ciena.

5.      On January 23, 2015, Defendant Hartford extended an offer of employment to Plaintiff for the position of Director of Admissions and Marketing. Plaintiff's offer letter notes that the position is a full-time, salaried exempt

**Kitch Drutchas Wagner Valitutti & Sherbrook**
ATTORNEYS AND COUNSELORS
ONE WOODWARD AVENUE, SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

1

position, with a rate of pay of $22.00. Plaintiff signed the offer letter the same day. (Ex. B, Job Offer Letter).

6.     On February 9, 2015, Plaintiff attended an Admission's Department Orientation wherein she was trained in her job duties Plaintiff received additional training on November 30, 2015. (Ex. C, Orientation Sign In Forms).

7.     That same day, Plaintiff signed the Director of Admissions and Marketing Job Description, which notes that the Director is required to ensure admissions occur twenty-four hours a day, seven days a week. (Ex. D, Job Description).

8.     The Job Description for the Director position was drafted in 2012 by Nancy Erwin, the Human Resources Director for Ciena, with input from Christine Wade, Ciena's Director of Census and Marketing. The Job Description has not been amended or changed since 2012. (Ex. E, Declaration of Nancy Erwin).

9.     The FLSA provides overtime exemptions for employees that are employed as bona fide administrative employees. The Director of Admissions and Marketing is properly classified as an overtime exempt, administrative employee based on salary and the primary duties of the position. As an exempt administrative employee, Plaintiff was never entitled to additional pay for alleged overtime.

10.    In addition, Plaintiff was not entitled to additional pay for time spent on-call. Plaintiff's time was predominantly for her own benefit and Defendant

Kitch Drutchas
Wagner Valitutti
& Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward
Avenue, Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

2

Hartford's on-call conditions were not unusually onerous or overly restrictive. Plaintiff was not frequently called on the weekends or during non-business hours.

11.    On February 3, 2017, Plaintiff resigned from her position without notice. (Ex. F, Resignation Letter)

12.    Plaintiff has failed to raise a genuine issue of material fact to dispute that she was an exempt administrative employee and thus not entitled to overtime pay.

13.    Plaintiff has failed to raise a genuine issue of material fact to dispute that she was not entitled to pay for time worked while on call.

14.    On August 17, 2017, defense counsel sought concurrence in this motion via telephone but concurrence was not forthcoming.

15.    For the reasons stated herein, and in Defendants' brief in support of motion for summary judgment, Defendants are entitled to summary judgment of dismissal as a matter of law. Defendant is further entitled to costs, expenses, attorney fees, interest and/or sanctions, together with any and all other further relief in Defendant's favor that this Court may deem just and appropriate.

WHEREFORE, Defendants, Ciena Health care Management, Inc., and Hartford Nursing & Rehab, respectfully request that this honorable Court grants this Motion for Summary Judgment pursuant to Fed R. Civ. P 12(b)(6) and 56(c) and dismiss all or part of Plaintiff's civil action and award Defendants costs,

Kitch Drutchas
Wagner Valitutti
& Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward
Avenue, Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

3

expenses, attorney fees, interest, and/or sanctions, together with any and all such

other relief as the Court may deem just and appropriate.

<div style="margin-left:40%">

Respectfully submitted,

KITCH DRUTCHAS WAGNER
VALITUTTI & SHERBROOK

</div>

By:   s/Zeth D. Hearld
           Karen B. Berkery P38698
           Zeth D. Hearld P79725
           Attorneys for Ciena Health Care
           Management, Inc. and Hartford
           Nursing and Rehabilitation Center
           One Woodward Avenue, Suite 2400
           Detroit, MI 48226-5485
           313-965-7846

Dated: August 18, 2017    Zeth.hearld@kitch.com

Kitch Drutchas
Wagner Valitutti
& Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward
Avenue, Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DISTRICT

SHEILA TATUM BUTLER,

      Plaintiff,

v

CIENA HEALTH CARE
MANAGEMENT, INC. and
HARTFORD NURSING AND
REHABILITATION CENTER,

      Defendants.

_____/

Civil Case No.: 16-14071

Honorable Hon. Sean F. Cox

## BRIEF IN SUPPORT OF DEFENDANT HARTFORD NURSING & REHAB'S MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ............................V

STATEMENT OF ISSUES PRESENTED..........................................................X

STATEMENT CONTROLLING AUTHORITY .................................................XI

STATEMENT OF FACTS ...............................................................................1

I.     RELATIONSHIP BETWEEN CIENA HEALTH CARE
       MANAGEMENT, INC. AND HARTFORD NURSING AND
       REHABILITATION CENTER ...............................................................1

II.    PLAINTIFF'S PRIOR EMPLOYMENT HISTORY ...............................1

III.   PLAINTIFF'S EMPLOYMENT WITH HARTFORD ...........................3

IV.    JOB DUTIES OF THE DIRECTOR OF ADMISSIONS AND
       MARKETING........................................................................................4

V.     OVERTIME AND ON CALL TIME .......................................................9

ARGUMENT ...............................................................................................10

I.     PLAINTIFF WAS PROPERLY CLASSIFIED AS AN
       OVERTIME EXEMPT EMPLOYEE UNDER THE
       ADMINISTRATIVE EXEMPTION AND WAS NOT
       ENTITLED TO OVERTIME PAY .......................................................11

       A.     The Director of Admissions and Marketing Meets the
              Second Element of the Administrative Exemption, as
              the Director's Primary Duty is Office Work Directly
              Related to Hartford's General Business Operations....................12

       B.     The Director of Admissions and Marketing Meets the
              Third Element of the Administrative Exemption, as the
              Director's primary duty includes the exercise of
              discretion and independent judgment with respect to
              matters of significance.................................................................15

II.    PLAINTIFF IS NOT ENTITLED TO COMPENSATION
       FOR TIME SPENT ON-CALL .............................................................18

A.    The conditions placed on Plaintiff's activities were not restrictive and Plaintiff could effectively use her time for personal pursuits ....................................................... 18

B.    Any time spent on-call was de minimis in nature ........................ 24

CONCLUSION ..................................................................................... 25

# INDEX OF AUTHORITIES

**Cases**

*Adair v. Charter County of Wayne*
    452 F.3d 482 (6th Cir. Mich. June 22, 2006) .................................................. 20, 21

*Armour & Co. v. Wantock*
    323 U.S. 126 (1944) ........................................................................................ 19

*Celotex Corp. v. Catret*
    477 U.S. 317 (1986) ........................................................................................ 11

*Foster v. Nationwide Mut. Ins. Co.*
    710 F.3d 640 (6th Cir. Ohio Mar. 21, 2013) ................................................. 11, 16

*Lutz v. Huntington Bancshares, Inc.*
    815 F.3d 988 (6th Cir. Ohio Mar. 2, 2016) .............................................. 13, 14, 16

*Martin v. Ohio Turnpike Com.*
    968 F.2d 606 (6th Cir. Ohio July 7, 1992) ................................................... 19, 20

*Renfro v. Ind. Mich. Power Co.*
    370 F.3d 512 (6th Cir. Mich. June 2, 2004) ........................................... 12, 13, 17

*Skidmore v. Swift & Co.*
    323 U.S. 134 (1944) ........................................................................................ 19

**Statutes**

29 CFR 541.201(a) .............................................................................................. 12

29 CFR 541.202 .................................................................................................. 16

29 CFR 541.202(a) .............................................................................................. 16

29 U.S.C. § 207(a) .............................................................................................. 18

29 U.S.C. §207(2) ............................................................................................... 11

29 U.S.C. §213 *et seq.* ...................................................................................... 11

**Rules**

Fed. R. Civ. P. 56 .......................................................................................................11

## <u>STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>

**1.**    Section 13(a)(1) of the Fair Labor Standards Act ("FLSA") provides overtime exemptions for employees that are employed as bona fide administrative employees.

**2.**    On January 29, 2015, Hartford Nursing & Rehabilitation Center extended an offer of employment to Plaintiff for the Director of Admissions and Marketing position.  The job offer noted that the position was a full time, salaried, overtime exempt position. Plaintiff signed the job offer. (Ex. B)

**3.**    Defendant Ciena Health Care Management, Inc. ("Ciena") provides management services to Hartford Nursing and Rehabilitation Center ("Hartford"). (Ex. A).

**4.**    Plaintiff was never employed by Defendant Ciena. Plaintiff was solely employed by Defendant Hartford. (Ex. B).

**5.**    On February 9, 2015, Plaintiff attended orientation for the Admissions Department, wherein she was trained in her job duties. That same, day, Plaintiff signed the Director of Admissions and Marketing Job Description, which notes that the Director needs to ensure referrals are responded to on a 24/7 basis. (Ex. C, Ex. D, p)

**6.**   The Director of Admissions and Marketing Job Description was drafted in 2012 by Nancy Erwin, Ciena's Human Resources Director. The Job Description has not been changed since 2012. (Ex. E).

**7.**   Jessica Fairweather, nee Brantley, was also employed as a Director of Admissions and Marketing, and worked alongside Plaintiff until Ms. Fairweather's resignation in November 2016. (Ex. L, Ex. M, p 12, Ex. I, p 33).

**8.**   Defendant Hartford utilizes a computer program called "ECIN" for patient referrals. The majority of referrals are received via ECIN. (Ex. K, p 9, Ex. N, p 5).

**9.**   If a hospital does not use ECIN, referrals come in via fax. Faxed referrals are only sent to Hartford directly, and the Director of Admissions and Marketing would not be aware of a faxed referral unless they were physically in the facility. If a faxed referral came to the facility after hours, the Director would not respond to the referral until the next day. (Ex. I, p 107, Ex. N, pp 53-54)

**10.**  The Director of Admissions and Marketing is an independent position that makes the majority of decisions to admit or deny patients that are referred to Hartford. (Ex. K, p 9-10, Ex, N, p 9-10, Ex. O).

**11.** In order to respond to referrals, Defendant Hartford and the Director utilize the "Green Light Process." (Ex. K, p 9, Ex. M, p 25-26, Ex. N, p 9, Ex. O).

**12.** In order to analyze referrals, Directors utilize the Admissions Screening Tool. (Ex. I, p 39, Ex. N, p 6-7, 9).

**13.** The Admissions Screening Tool is divided into two parts. Patient conditions "above the line" are considered a green light. Anything below the line is considered a yellow light. (Ex. M, p 17, 25-26, Ex. N, p 9, Ex. O).

**14.** If a referred patient is considered a green light, the Director can admit the patient based on their own decision making after analyzing the referral file. (Ex. M, 25-26, Ex. N, p 9, Ex. O).

**15.** If a referred patient is considered a yellow light, the Director can still admit the patient. The Director would need to discuss the patient with the Director of Nursing or Clinical Coordinator to reach a decision together based on the Director's initial review of the file. (Ex. I, p 64, Ex. M, p 25-26, Ex. N, p 8-9, Ex. O, Ex. K, p 11).

**16.** As referrals could come at any time, Plaintiff was required to respond to referrals that came after work hours or on the weekends. (Ex. I, p 36, 77, Ex. K, p 13, Ex. N, p 22).

**17.** For the majority of her employment, Plaintiff alternated on-call weekends with her fellow Director of Admissions, Jessica Fairweather. Following

Ms. Fairweather's resignation, Plaintiff alternated on-call weekends with Director of Admissions Nikkia Landrum. (Ex. I, p 62, 104-105).

18. From February 1, 2015 through February 28, 2017 there were a total of 5,878 referrals received via ECIN. (Ex. Q)

19. Of the 5,878 referrals, 323 occurred on the weekend. From February 1, 2015 through February 28, 2017, there were 171 Sunday referrals and 152 Saturday referrals. (Ex. Q).

20. Of the 5,878 referrals, 5,700 referrals came between the hours of 8 a.m. and 5 p.m. Thus, 178 calls came prior to 8 a.m. or after 5 p.m. (Ex. R)

21. If you divide the calls by two, there were 89 calls afterhours, which equals 7.4 calls per month, fielded by two Directors. Assuming they are alternating calls, that is 3.7 after hour calls per month fielded by each Director. (Ex. R).

22. On average, it takes 10-15 minutes to respond to a referral. (Ex. M, p 37, Ex. O)

23. The Director is expected to respond to 65% of referrals within 15 minutes. (Ex. N, p 20).

24. The Director of Admissions and Marketing is also expected to provide tours to patients, perform rounds with doctors at hospitals to market the facility, to build relationships with discharge planners and social workers to increase referrals and build census, and to lead census development meetings to

strategize ways to increase census and referrals. (Ex. I, p 48-49, 60, 61, 65-66, Ex. N p 35-36, 38).

## STATEMENT OF ISSUES PRESENTED

I.    Does Plaintiff fail to raise a genuine issue of material fact regarding her claims for overtime wages?

    **Defendants answer**:      Yes.

    **Plaintiff answers**:      No.

II.    Does Plaintiff fail to raise a genuine issue of material fact regarding her claims for wages for on-call time?

    **Defendants answer**:      Yes.

    **Plaintiff answers**:      No.

x

## <u>STATEMENT CONTROLLING AUTHORITY</u>

Defendants rely on *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) as well as *Ryan v. General Motors Corp.*, 929 F.2d 1105 (6th Cir. Mich. 1989) for the proposition that Plaintiff has failed to state a claim beyond mere conclusory allegations.

Defendants rely on *Foster v. Nationwide Mut. Ins. Co.,* 710 F.3d 640 (6th Cir. Ohio Mar. 21, 2013) and other case law cited herein for the proposition that Plaintiff was employed in a bona fide administrative capacity and was thus not entitled to additional compensation for alleged overtime worked.

Defendants rely on *Martin v. Ohio Turnpike Com.,* 968 F.2d 606 (6th Cir. Ohio July 7, 1992) and other case law cited herein for the proposition that Plaintiff is not entitled to alleged unpaid wages for time spent on-call, as Plaintiff was able to use her personal time predominantly for her own benefit and any alleged time spent on-call was *de minimis* in nature.

## STATEMENT OF FACTS

**I.    Relationship between Ciena Health Care Management, Inc. and Hartford Nursing and Rehabilitation Center**

Defendant Ciena Health Care Management, Inc., ("Ciena") provides management services for Defendant Hartford Nursing and Rehabilitation ("Hartford"). (Ex. A, Management Agreement Excerpt). Hartford is a long and short term nursing and rehabilitation center. Mohammad Qazi owns both Ciena and Hartford, but Ciena has no ownership interest in Hartford. (Ex. G, p 6, Deposition of Nancy Erwin). Instead, Ciena acts as a consultant to Hartford, which is in turn run by the facility administrator. Ciena does provide policies regarding referral requirements for the Director of Admissions and Marketing Position "(Director"). (Ex. G, p 7). The job description for the Director of Admissions and Marketing was created by Nancy Erwin, the Director of Human Resources at Ciena, in 2012. (Ex. E). Ms. Erwin drafted the Job Description with the input of Christine Wade, Ciena's Director of Census and Marketing. The Job Description has not been amended or changed since 2012. (Ex. E).

**II.    Plaintiff's Prior Employment History**

Prior to her employment at Hartford, Sheila Tatum Butler ("Plaintiff") worked at two other nursing and rehabilitation centers as a director of admissions. (Ex. H, Plaintiff's Resume to Hartford). Plaintiff testified that from December 2010 through 2011, she was the Director of Admissions at Ambassador Nursing

1

Centre ("Ambassador"), and from August of 2011 until December 2013, she testified that she was the Director of Admissions at Beaconshire Nursing ("Beaconshire"). (Ex. I, Plaintiff's Deposition). Notably, Plaintiff testified that she believed there is no difference between an Admissions Director and an Admissions Coordinator, that they perform the same tasks, and that even though her resume states she was the Director at Ambassador, she was actually a Coordinator. (Ex. I, pp 14, 18). Plaintiff testified that while at Beaconshire, she was a Director, she was an hourly employee, and that she was able to admit referrals without consulting anyone. (Ex. I, pp 24-25). She then testified that she left Beaconshire because she "sought other avenues," that she "chose to go into a different field or a different avenue in my life" and that she then went to Hartford. (Ex. I, pp 26-27). Plaintiff's Beaconshire personnel file contradicts the majority of her testimony. The records show she was a salaried employee, not hourly. (Ex J, Beaconshire Records) Moreover, she did not leave Beaconshire to pursue other "avenues;" Plaintiff resigned on November 22, 2013 without notice following requests by the facility Administrator to cc her on reports, and claimed she was too stressed to work. She did not even apply to Hartford until January 22, 2015. (Ex. J). Plaintiff continued to provide misleading testimony throughout her deposition in regards to her job duties and level of authority, which was directly contradicted by Ciena consultants, Hartford's Administrator, and by her most recent and the current Director, as well

2

as her former co-Director.

### III.    Plaintiff's Employment with Hartford

On January 29, 2015, Hartford offered Plaintiff the position of Director of Admissions and Marketing. (Ex. B). Plaintiff's signed letter noted that the position was a full time, salaried exempt position. Moreover, Plaintiff was made aware the position required 24/7 coverage for referrals during her interview. (Ex. K, p 12 Dep. of Lakeisha Bell). On February 9, 2015, Plaintiff began working for Hartford and attended orientation for training[1]. (Ex. C). That same day, Plaintiff signed the Director of Admissions and Marketing Job Description, which noted the position required 24/7 coverage. (Ex. D, p 2).

When Plaintiff was hired, she worked alongside a second Director, Jessica Fairweather. (Ex. G, p 33). Ms. Fairweather was hired as a Director of Admissions March 25, 2014. (Ex. L, Offer Letter to J. Fairweather). Although she was hired as a Director, Ms. Fairweather was mistakenly coded in payroll as a Coordinator, and thus was paid on an hourly basis when she should have been salaried. This was ultimately corrected and Ms. Fairweather was properly converted to a salaried employee. (Ex. E, p 19). Ms. Fairweather testified that she was hired and trained as a Director, despite the efforts of a former Director to train her as a Coordinator. (Ex. M, Deposition of Jessica Fairweather).

---

[1] Plaintiff received additional training on November 30, 2015. (Ex. C).

IV.    **Job Duties of the Director of Admissions and Marketing**

The Director is responsible for all admission department activities including the pre-admission, admission, and follow-up process. (Ex. C, p 1). The Director is required to ensure that admissions occur on a 24/7 basis, as referrals can come from a hospital at any time. (Ex. C, p 2). The primary way all nursing homes receive patients is through electronic referrals through ECIN from various hospitals. Plaintiff was given a phone so that she could respond to referrals at any given moment. (Ex. G, p 35-36). Aarti Toth, Ciena's Regional Director of Census and Marketing, acts as a consultant to Directors of Admissions for Ciena-managed facilities. (Ex. N, p 4). She testified that the Director of Admissions is "one of the biggest drivers" for increasing the facility census. (Ex. N, p 7). As such, the primary duty of the Director is to maintain the census and bring patients into the facility, and the Director makes all decisions whether to admit or deny a patient. This is accomplished through analyzing referrals received from hospitals and deciding whether a patient should be admitted or denied based on their financials and medical condition. (Ex. M, p 17-18, Ex. N, p 7-9).

Plaintiff was trained on ECIN and appropriate referral responses. (Ex. C, Ex. I, p 42). ECIN is a web-based program used by Hartford, and is where the majority of patient referrals are received. (Ex. I, p 42-43, Ex. N, p 5). ECIN is installed on the Director's phone, and notifies the Director when a referral is received. (Ex. G,

p. 43). When a patient is set to be discharged by a hospital, the hospital discharge planner or social worker sends a request through ECIN for an open bed. (Ex. I, p 43). ECIN referrals include the patient's diagnosis, patient demographics, and the patient's insurance status. (Ex. I, p 43-44).

Plaintiff falsely testified that she did not have the authority to deny patient referrals and that she had to consult with others before accepting any patients. (Ex. I, p 38, 41). However, Defendant Hartford utilizes the "Green Light Process" for accepting or denying patients referred to the facility by hospitals. (Ex. M, p 25-26, Ex. O, Declaration of Nikkia Landrum). Hartford also uses an Admissions Screening Tool ("AST") to analyze referrals and aid the decision making process. (Ex. I, p 39, Ex. N, p 6-7). Pursuant to the Green Light Process, the Director has the authority to admit or deny a referral based on her own decision making. (Ex. M, p 25, Ex. O). The Director is expected to read the referral file and make a decision to admit or deny the patient, based on whether the patient meets certain requirements. (Ex. M, p 16, Ex. N, p 6). When a referral is received via ECIN, it normally takes 10 to 15 minutes to analyze the patient's medical file and make a decision to admit or deny the patient. (Ex. M, p 37, Ex. O). The Director is expected to perform an initial medical screening and then review the insurance to be sure the patient has the financial means to be admitted. (Ex. I, p 37-38, Ex. M, p 17-18). The Director needs to understand the needs of the patient based on the

referral, as well as their benefit and insurance authorization status. (Ex. N, p 7). If a referral is considered a "green light," that means the Director can make a decision to admit or deny the patient based on their own evaluation. (Ex. N, p 9, Ex. M, p 25). The Director is not required to consult with the Director of Nursing ("DON"), the Regional Clinical Coordinator, or the Regional Director of Operations prior to accepting or denying a green light referral. (Ex. O). If a patient is denied, the Director is required to inform the Clinical Coordinator or DON that the patient was going to be denied, but does not need to ask permission to deny the patient. (Ex. M, p 17, Ex. N, p 33-34).

The AST is divided into two parts, with the top half representing conditions that would be considered a green light, and the bottom half representing conditions that would be considered a "yellow light." (Ex. N, p 9, Ex. P, Admissions Screening Tool). Again, any patient that is considered above the line can be admitted. A yellow light means that the patient is considered high acuity, and the Director would need to consult with the DON or clinical coordinator. (Ex. M, p 26, Ex. O). A yellow light does not mean that the patient cannot be accepted by the facility; the Director would be expected to know the entire file and discuss with the DON why they believe the facility can or cannot accept the patient. (Ex. I, p 26, Ex. N, p 8-9, Ex. O). The AST is not considered a checklist and is not all inclusive in terms of patient conditions, and the Director is able to deviate from the

Screening Tool. (Ex. N, p 14-15, 44-47). Ms. Fairweather testified she did not use the AST at home when taking calls, but made notes in a notebook. (Ex. M, p 37). Moreover, the AST is meant to keep the referrals organized, and allow the Director to find opportunities to increase census by reviewing diagnosis that have been accepted or denied, and find ways to take more patients. (Ex. N, p 14-15, 47). It is the Director's job to determine whether the patient's condition and diagnosis is "above the line" and thus acceptable, and the Director needs to be able to "read the referral, understand the medical information, and say yes . . . or say I have to talk to my [DON] because it's very complicated." (Ex. N, p 32). The majority of referrals received by the facility were considered "green light" patients. (Ex M, p 26). The average time to respond to a referral is 10 to 15 minutes. (Ex. M, p 37, Ex. O). The Director is expected to respond to 65% of referrals within 15 minutes of receipt. (Ex. N, p 20).

The Director is an autonomous position, and Hartford is considered the "prime example of how the green light process works," as the process allows the Director to make decisions based on their own evaluations of the referral. (Ex. N, p 9-10, Ex. O). It allows "the admission team to . . . independently bring in residents without going through the DON or anyone else." (Ex. K, p 9-10). The facility's Administrator, Lakeisha Bell, and DON would only review referrals on rare occasions, and often times would not know "who was admitted [until] the next

7

morning." (Ex. K, p 10). The only time Ms. Bell or the DON would review a referral was if the Director brought up a referral that the Director "didn't understand or something complex . . .[or] something they come to us with a question about." (Ex. K, p 10-11).

The Director has multiple other job duties. In order to improve the census, the Director is required to maintain a good relationship with physicians and social workers at the various hospitals so they continue to send referrals. (Ex. I, p 48-49). The Director is required to ensure that patients sign contracts and obtain insurance authorizations. (Ex. I, p 65). The Director is required to round in the hospitals in order to have face-to-face meetings with prospective patients. (Ex. I, p 49). The Director would also provide tours to prospective family members and patients. (Ex. I, p 60, Ex. M, p 21). The Director is required to lead census development meetings to strategize plans for increasing census, and prepare daily, weekly, and monthly census reports to update the facility. (Ex. I, p 61, 66, Ex. N, p 35-36). The end of month report would include all patients that were accepted, that were denied, what their insurance was, the physician at the referring hospital, and any follow up notes. (Ex. N, p 34). The Director is expected to review the report and strategize and identify ways to increase accepted referrals. (Ex. N, p 35). The weekly census development meeting includes all the facility department heads, and the Director leads the meeting and reviews the budget, the census, marketing plans,

and census goals for the week. (Ex. N, p 35-36). The daily report shows how many admissions and discharges were performed for the day, as the Director is the main source of knowledge for the facility regarding the facility census. (Ex. N, p 38).

## V.    Overtime and On Call Time

For the majority of her employment tenure, Plaintiff worked alongside Ms. Fairweather. Facilities typically operate with two Directors of Admissions and Marketing in order to ensure 24/7 coverage for referrals. Directors have the authority to set their own schedules, and oftentimes were encouraged to stagger their schedules to maximize coverage and minimize overlap. (Ex. N, p 42). Although Plaintiff and Ms. Fairweather chose not to stagger schedules, they alternated on-call weekends. When Ms. Fairweather resigned, Plaintiff alternated with Nikkia Landrum. (Ex. I, p 104-105).

On November 10, 2015, a roundtable meeting was held at Ciena's corporate headquarters. Plaintiff and Ms. Fairweather were present, as were Ms. Bell, Ms. Toth, Mr. Brogger, and others. During the meeting, the group discussed the 24/7 coverage requirement as well as responding to ECIN referrals within 15 minutes of receipt. (Ex. I, p 79). On November 30, 2015, another meeting was held, where weekend coverage was discussed. During this meeting, Ms. Fairweather asked if they had to answer ECIN referrals afterhours, and was informed that it was an expectation that they do so. Ms. Fairweather then asked if

they were compensated for the hours. (Ex. I, pp 80-82, Ex. M, p 31). It was then discovered that Ms. Fairweather had been mistakenly coded as a Coordinator, and thus paid on an hourly basis, rather than a salaried Director. (Ex. M, p 31). Ultimately, Ms. Fairweather was properly recoded to a Director. (Ex. G, p 19).

For a two year period while Plaintiff was employed, from February 1, 2015 through February 28, 2017, there were a total of 5,878 referrals via ECIN. (Ex. Q, Online Referral Data by Day). Of the 5,878 referrals, 323 were on the weekend, with 171 Sunday referrals and 152 Saturday referrals. (Ex. Q). Notably, of the 5,878 referrals, 5,700 came between the hours of 8 a.m. and 5 p.m. (Ex. M, p 24, Ex. R, Online Referral Data by Hour). Thus, any referrals received on the weekend or after hours were *de minimis* in nature. Based on the objective facts and data, the on-call conditions were not unusually onerous and did not prevent Plaintiff from using her personal time for her own benefit. She was able to simply pull up the referral on her phone, review it, and admit or deny the patient. (Ex. M 37, 39, Ex. N, p 25). There were days when the Director did not receive any referrals afterhours. (Ex. M, p 35-36).

## ARGUMENT

Summary judgment is appropriate where the moving party can show that based on the record presented and taking the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact as to the plaintiff's

claims and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

**I.    Plaintiff Was Properly Classified as an Overtime Exempt Employee Under the Administrative Exemption and Was Not Entitled to Overtime Pay**

Plaintiff alleges that she was not paid overtime in accordance with the Fair

Labor Standards Act ("FLSA"). The FLSA provides that any employee, not

exempt, shall receive 1½ times their regular rate of pay for any hours worked over

40 in a workweek. 29 U.S.C. §207(2). However, FLSA sets forth certain

exemptions from the overtime requirement. 29 U.S.C. §213 *et seq.* The FLSA

"exempts any employee employed in a bona fide executive, administrative, or

professional capacity." *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 642 (6th

Cir. Ohio Mar. 21, 2013) (citing 29 U.S.C. § 213(a)(1)(quotations omitted).

Authority was delegated to the Department of Labor ("DOL") to issue regulations

to define and the exemptions. *Id.* (citations omitted). The regulations state that the

administrative exemption covers employees that are:

> (1) Compensated . . . at a rate of not less than $455 per week . . . ;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.
> *Id*. (citing 29 C.F.R. § 541.200(a))

The administrative exemption "is to be narrowly construed against the employer,

and the employer bears the burden of proving each element by a preponderance of

the evidence." *Id*. Plaintiff was employed as the Director of Admissions and Marketing, a full time, salaried, overtime exempt position. She has failed to raise a genuine issue of material fact that she was entitled to wages for alleged overtime work, and as such her claim for unpaid overtime wages should be dismissed.

A. ***The Director of Admissions and Marketing Meets the First and Second Element of the Administrative Exemption, as the Director's Primary Duty is Office Work Directly Related to Hartford's General Business Operations.***

In this case, it is indisputable that the first element of the exemption has been met, as Plaintiff was compensated on a salary basis and received more than $455 per week. (Ex. I, p 33). It is indisputable that the second element is met, as Plaintiff's primary duty was the performance of office or non-manual labor work directly related to the management or general business operations of Hartford. (Ex. D).

To meet the second requirement, an employee "must perform work directly related to assisting with the running or servicing of the business." 29 CFR 541.201(a). Employees that "engage in work that is "ancillary to an employer's principal production activity" are considered administrative employees and thus exempt. *Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 517 (6th Cir. Mich. June 2, 2004). In *Renfro*, the plaintiff employees were planners that worked for defendant AEP, which operated power plants. The planners identified new construction work, took job orders, and created plans that would be used in the field by craft workers.

12

*Id.* at 515. The court found that the planners' primary job of "interpreting and carrying out plant policies, creating plans that permit the continued operation of the equipment and systems that generate AEP's main product--affects AEP's general business operations to a substantial degree." *Id.* at 518. The court further noted that although the planners' job involved some "routine clerical tasks, the planners' primary duty" was not clerical in nature. *Id.*

Similarly, in *Lutz v. Huntington Bancshares, Inc.*, 815 F.3d 988 (6th Cir. Ohio Mar. 2, 2016), the plaintiffs were underwriters whose primary job duties included providing credit products to customers after they reviewed loan applications against the employer's credit standards. *Id*. The underwriters alleged they should not have been classified as exempt from overtime as administrative employees. Underwriters first confirmed that information provided in loan applications was accurate using "cash-flow analysis and pay-stub calculation worksheets to calculate the applicant's income. Underwriters also compare the information provided in the application to a credit-bureau report." *Id*. Then they decided whether the customer qualified for the loan. The underwriters received applications electronically, and their software initially recommended whether the loan should be approved or denied. *Id*. The underwriters "essentially review[ed] that recommendation" by applying "the Bank's guidelines ("the Guidelines") . . . as well as any pertinent regulations, to determine whether the loan would fall within

13

Huntington's acceptable level of risk." *Id*. at 990-91. The bank's Guidelines contained thousands of pages, including "written manuals, policies, and procedures that catalogue the factors an underwriter must consider in order to determine whether a customer is eligible for a particular loan." *Id*. Underwriters would review the applications, and then apply the Guidelines. They were expected to "exercise their judgment regarding credit decisions objectively." *Id*. at 991. Ultimately, the loan process ended when the underwriters reviewed the loan, applied the guidelines and exercised their own judgment to either approve or deny the loan. *Id*. The Court found that the underwriters performed administrative work because they assisted "in the running and servicing of the Bank's business by making decisions about when Huntington should take on certain kinds of credit risk, something that is ancillary to the Bank's principal production activity of selling loans." *Id*. at 993.

The Director, like the underwriters, is indisputably involved in the performance of office work directly related to the management or general business operations of Hartford. The Director is "responsible for managing the facility's census" and is also "responsible for all admission department activities including the pre-admission, admission, and follow up process." (Ex. C, p 1). Hartford is a short-term and long-term care facility; its primary business is the care of patients. The Director is the gatekeeper for referred patients and must analyze which

patients the facility can or cannot accept at any given moment. The Director is the one of the "biggest drivers" for increasing and maintaining the facilities census, i.e. bringing in patients. (Ex. N, p 7) As described in the Facts, the Director of Admissions is required to review all patient referrals and decide whether to admit or deny the patient. (Ex. M, p 17-18, Ex. O). Plaintiff testified that her job was to essentially bring patients into the facility and keep the census numbers up[2]. (Ex. I, p 99-100). She was further required to provide tours for families of prospective residents and prepare for and participate in a weekly census development meeting, and participate in conference calls regarding referrals with Ciena. (Ex. I, p. 45-47). In addition, she was required to maintain a relationship with discharge planners and social workers, as well as round with physicians, to bring patients in and raise the facility census. (Ex. I, p 49, Ex. M,). Similar to the planners in *Renfro* and the underwriters in *Lutz,* the Director assists in the running and servicing of Hartford's business by deciding which patients to admit or deny, which is ancillary to Hartford's primary business of caring for patients.

### B. The Director of Admissions and Marketing Meets the Third Element of the Administrative Exemption, as the Director's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

The third element required for the administrative exemption requires that an

---

[2] Plaintiff was fixated primarily on bringing in Medicare patients, as they are more profitable for the facility.

employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." *Foster, supra* at 646 (citing 29 C.F.R. § 541.200(a)(3)). The regulations note that, generally, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed." 29 CFR 541.202(a). Factors to consider when evaluating whether the exercise of discretion and independent judgment include, but are not limited to:

> whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; . . . whether the employee has authority to waive or deviate from established policies and procedures without prior approval; . . . whether the employee is involved in planning long- or short-term business objectives
> 29 CFR 541.202

As the Sixth Circuit Court of Appeals noted in *Lutz,* an employee "employees whose decisions are ultimately reviewable can still exercise discretion and independent judgment." *Lutz, supra* at 996 (citing 29 CFR 541.202(c)).

Despite Plaintiff's attempt to paint her role in analyzing patient referrals as merely checking off boxes on the AST and asking the DON or Clinical Coordinator for permission to admit or deny referred patients, the Director is in

16

reality a "very independent job" and a "self-driven role . . . to bring in admissions." (Ex. K, p 21-22). Plaintiff carried out important tasks that substantially affected the business, as she had to ensure the census was maintained in the building and continue bring patients into the facility. (Ex. M, p 20). The Director "answer[s] the calls" and makes the relationships with the discharge planners, and the facility Administrator rarely interacted with her. (Ex. K, p 21-22). The Director is typically the only employee that knows who is being admitted, and rarely has to consult with others regarding who is admitted or denied. (Ex. K, p 11). As Ms. Fairweather testified, the Director has the authority to accept or deny patient referrals under the Green Light Process, and is only required to consult with, not ask permission from, the DON or Clinical Coordinator, if the referral is considered a "yellow light" under the AST. (Ex. M, pp 25-26 , Ex. O). As testified to by Ms. Toth and Ms. Landrum, the AST does not make the decision for the Director and is not a check list. Although the Director uses the AST when analyzing referrals, she has the authority to deviate from it and accept or deny patients based on her own knowledge. (Ex. N, p 14, Ex. O). It is not an "encyclopedia of strict requirements." *Renfro, supra* at 577. Moreover, Ms. Fairweather testified that if a referral came in while she was at home, she did not even use the Tool. (Ex. M, p 39). The Director sets long and short term business objectives, as she was expected to lead weekly census development meetings to develop strategies for marketing and increasing

17

census for the facility. (Ex. N, p 35). Thus, the Director meets all three prongs of the administrative overtime exemption and Plaintiff is not entitled to any alleged wages for overtime. Moreover, Plaintiff has failed to produce any evidence indicating how much overtime she allegedly worked.

## II.    <u>Plaintiff Is Not Entitled to Compensation for Time Spent On-Call</u>

Plaintiff alleges she is entitled to compensation for on-call time, and that she was unable to use her personal time efficiently for her own purposes. However, as an exempt employee, Plaintiff was not entitled to additional compensation for time spent on-call. The conditions for on-call time were not overly restrictive or unusually onerous, and did not prevent Plaintiff from utilizing her personal time effectively for her own purposes. Moreover, any time spent on-call was *de minimis* in nature, and Plaintiff has failed to produce any evidence establishing how long or how often she was actively working on-call, and the available referral data demonstrates that referrals rarely came in during non-business hours or on the weekends.

### A. *The conditions placed on Plaintiff's activities were not restrictive and Plaintiff could effectively use her time for personal pursuits*

The FLSA, under 29 U.S.C. § 207(a), "provides that employees must be compensated at one and one-half times their regular rate for overtime work. Although the FLSA does not state whether time spent on call is working time, the Supreme Court has held that, under some circumstances, waiting time is

compensable." *Martin v. Ohio Turnpike Com.*, 968 F.2d 606, 609 (6th Cir. Ohio July 7, 1992) (citing *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944); *Skidmore v. Swift & Co.*, 323 U.S. 134, 136 (1944). In determining whether on-call time is considered working time, "the result turns on whether an employee's time "is spent predominately for the employer's benefit or for the employee's," a question "dependent upon all the circumstances of the case." *Id.* (citing *Armour, supra* and *Skidmore, supra*). The Sixth Circuit Court of Appeals in *Martin* held that "on-call time spent at home may he compensable if the restrictions imposed are so onerous as to prevent employees from effectively using the time for personal pursuits." *Id.* at 611. The Court held that the mere "fact that some of the plaintiffs' activities have been affected" by on-call policies "is not sufficient to make the on-call lime compensable" *Id*. In *Martin*, the plaintiffs were highway maintenance workers for the defendant and were required to work emergency overtime on an on-call basis. There were two crews of workers, with one crew considered "on" and one considered "off"—the so called "on" crew would be called in first for emergency overtime situations. *Id*. at 607. The court reasoned that to show that the on-call policy seriously interfered with the ability to use time for personal pursuits, the employees could show that "the employer calls them back so frequently as to make effective use of the time impractical" or that "the employer's on-call system is so distracting or cumbersome as to seriously inhibit personal activities." *Id*. at

611. The Court noted that these examples were not the only way for employees to meet their burden, but they were representative examples. *Id.*

The plaintiffs in *Martin* failed to provide evidence to show how frequently they were called into work, nor could they show the on-call system was "unusually onerous." *Id.* at 611-612. The employees only needed to respond to a phone call or pager, and were not required to arrive when called within any specific timeframe, thus their travel was not severely limited. *Id.* at 612. The mere fact that employees used pagers did not amount to interference with their ability to use their free time. *Id.* Finally, although the employees testified that they had given up certain activities, they admitted that they still participated in various activities. *Id.* The Court found that "those admissions would preclude a finding that the plaintiffs are unable to use their time for their own pursuits." *Id.* The Court also noted that because the plaintiffs provided no evidence for how frequently they were called in, a jury would be unable to find that they were called in so frequently to make effective use of their time impractical. *Id.*

In *Adair v. Charter County of Wayne*, 452 F.3d 482 (6th Cir. Mich. June 22, 2006), the plaintiffs were police officers that worked in various specialty units, and alleged they were owed on-call pay. The plaintiffs were required to carry pagers and remain in specific geographic areas while off duty at all hours in order to respond to calls. *Id.* at 484-85. The court found the employees were not entitled to

on-call compensation. The court noted that the "on-call policy at issue . . . presents no objective restrictions on Plaintiffs' off-duty time besides requiring them to carry pagers." *Id*. There was no evidence they were subjected to discipline for failing to respond to a page while off duty. *Id*. at 488. They were also able to travel as they pleased while off-duty. Moreover, the Court found that the plaintiffs had "failed to demonstrate that they received so many calls that they could not effectively use their off-duty time. In three years, SRU-SWAT was called only once, while EOD-Bomb Squad and AI units were called in twice. The K-9 unit was called between fifteen to twenty times." *Id*. at 488-89. Finally, while at home the plaintiffs' activities were not restricted in any way, and the evidence revealed that the plaintiffs' "off-duty time was not utilized predominantly for the employer's benefit, but for the employees'." *Id*.

In this case, Plaintiff alleges that she is entitled to compensation for all times that she was on-call, and that she was on-call 24/7. Plaintiff asserted she was "not free to use her time efficiently for her own purposes. Rather, Plaintiff has to wait and promptly respond to any calls at all hours of the day." She has not provided any evidence of same. She had a phone that texted her referrals, which was completely portable. She could go anywhere with the phone. Plaintiff has failed to meet her burden and show that the on-call conditions were so restrictive that she could not use her time effectively for her personal pursuits, or that it imposed

21

burdens on her that seriously interfered with her ability to use her personal time. Plaintiff's time was predominantly for her benefit.

When asked to explain how the on-call requirement imposed on the Director position restricted her personal life Plaintiff's first response was that she "wouldn't be able to have margaritas because I'm on call. . . if I'd had too many, being at home, they would have probably reported it sound like I was maybe slurring my words." (Ex. I, p 126). There is no evidence Plaintiff was told she could not have an alcoholic drink on her own time, and moreover, Plaintiff admitted she never received a call while she was drinking and that since she alternated on-call weekends with Ms. Fairweather, she was still able to drink on the weekend. (Ex. I, p 126-27). Plaintiff further testified that she could not make crafts, including embroidery, because if she was interrupted, it would throw her stitching off, and "I wasn't able to do my hobbies, unless I was not on call for that weekend." (Ex. I, p 128). Plaintiff testified she could not participate in bowling leagues, but admitted she had not been in a league in three to four years. (Ex. I, p 130-131). Finally, Plaintiff testified that she won a contest for a small business development class at Schoolcraft College related to her crafting, which the calls interfered with. However, she admitted that she was able to attend some of the classes and just ignored the calls. (Ex. I, 133). Ms. Fairweather provided the extreme examples that she was once shopping with her mother while pregnant and received multiple calls

regarding the same referral, which caused her to spot. She also testified that she was once called while planning her baby shower. (Ex. M, p 15-16). Plaintiff was never disciplined for failing to respond to calls. Keep in mind, there are two directors receiving the calls, not just one.

Plaintiff's testimony is insufficient to meet her burden to establish that Defendants' on-call conditions were so restrictive that she could not effectively use her time for personal purposes. The on-call conditions were not unusually onerous, and Plaintiff's time was predominantly spent for her own benefit. The only real conditions of the on-call policy were that Plaintiff a) carry a cell phone equipped with ECIN and b) responds to 65% of referrals within 15 minutes of receipt. These are not overly burdensome nor restrictive, as they do not prevent Plaintiff form traveling or engaging in any activities. Plaintiff was not required to return to the Hartford facility to respond to referrals, and there is no evidence that she was told she had to sit and wait to answer referrals at all hours. Plaintiff's fellow Director admitted that she could respond to referrals at home without the AST, and Directors have acknowledged that it takes approximately 15 minutes to respond to a referral. (Ex. M, p 37, 39, Ex. O). As held in *Martin* and *Adair,* the mere fact that Plaintiff is required to carry a cell phone is not an interference with her use of personal time. Similar to the plaintiffs in *Martin,* Plaintiff admitted that she still participated in the activities that she claimed were restricted, in that she was able to

have alcoholic drinks on weekends she was not on call, she still engaged in craft making, and that she went to her small business class and just ignored the calls.

### B. Any time spent on-call or overtime was de minimis in nature

Even assuming, *arguendo,* that the on-call time conditions were so restrictive as to prevent effective use of her personal time, the duration and frequency of the on-call time were *de minimis* in nature. Plaintiff has failed to produce any evidence that the calls occurred with such frequency that she was unable to effectively use her time. Plaintiff routinely testified that the calls constantly interrupted her to the point she could not have a normal life. (Ex. I, p 132). This is in direct contradiction to the ECIN data produced during discovery, and any on-call time was *de minimis* in nature.

From February 1, 2015 through February 28, 2017, there were 5,878 referrals received via ECIN. In that two year period, 171 referrals were received on Sundays, and 152 referrals were received on Saturdays. (Ex. Q). 5,700 of those referrals came between the hours of 8 a.m. and 5 p.m., during normal business hours. (Ex. R). In two years with two directors taking calls, only 178 came prior to 8 a.m. or later than 5 p.m. (Ex. R). If you divide the calls by two, there were 89 calls afterhours in one year, which equals 7.4 calls per month, fielded by two Directors. Assuming they are alternating calls, that is 3.7 after hour calls per month. Plaintiff alternated on-call weekends with until November 1, 2016, when

24

Ms. Fairweather resigned, and alternated with Ms. Landrum after that. (Ex. I, p 104-105). Thus, she was not always on-call or required to respond to referrals after hours or every weekend. Plaintiff has failed to produce any evidence as to how long or how frequently she spent on-call, and the undisputed ECIN data demonstrates she was not frequently receiving referrals during non-business hours. Plaintiff alleges that there were more facilities sending referrals beyond the ECIN data. (Ex. I, p 107). If facilities did not use ECIN, they faxed the referrals, and if those referrals came after hours, Plaintiff would not receive them or be required to respond to them until the next business day. (Ex. N, p 53-54) Her co-workers testified that the referrals only take 10-15 minutes to analyze; it is unlikely that Plaintiff was significantly burdened. (Ex. M, 37 p, Ex. O)

### Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted and Plaintiff's Complaint should be dismissed in entirety.

<div style="margin-left:40%">

Respectfully submitted,
KITCH DRUTCHAS WAGNER
VALITUTTI & SHERBROOK

By:    s/Zeth D. Hearld

ZETH D. HEARLD (P79725)
Attorneys for Ciena Health Care
Management, Inc. and Hartford
Nursing and Rehabilitation Center
One Woodward Avenue, Suite 2400
Detroit, MI  48226-5485
313-965-7846
zeth.hearld@kitch.com

</div>

Dated:  August 18, 2017

25

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2017, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  Sandra Hanshaw Burink.


s/Zeth D. Hearld

ZETH D. HEARLD P79725
KITCH DRUTCHAS WAGNER
VALITUTTI & SHERBROOK
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
313-965-7846
Zeth.hearld@kitch.com

DET02:2410237.1